# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**STEVEN A. HALE**
Michigan City, Indiana

ATTORNEY FOR APPELLEE:

**CAREN L. POLLACK**
Pollack Law Firm, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CADDYSHACK LOOPER, LLC, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 46A03-1404-PL-110 |
| | ) | |
| LONG BEACH ADVISORY BOARD OF | ) | |
| ZONING APPEALS, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE LAPORTE SUPERIOR COURT
The Honorable Richard R. Stalbrink, Jr., Judge
Cause No. 46D02-1111-PL-139

**December 4, 2014**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Caddyshack Looper, LLC, ("Caddyshack") appeals the trial court's order affirming a decision by the Long Beach Advisory Board of Zoning Appeals (the "BZA") denying a request for a variance by Caddyshack. Caddyshack raises four issues which we consolidate and restate as whether the court erred in affirming the decision of the BZA. We reverse and remand.

FACTS AND PROCEDURAL HISTORY

Caddyshack owns certain real property with an address on Lake Shore Drive, Long Beach, LaPorte County, Indiana. The property is located on the north side of Lake Shore Drive and is adjacent to the Lake Michigan beachfront. In December 2010, a severe storm sheared a portion of Caddyshack's property facing Lake Michigan and created a five- or six-foot cliff from the existing grade. Shortly thereafter, Caddyshack contacted its general contractor, Thomas McCormick, who had constructed the house in 2009. In January 2011, McCormick submitted a building permit application to the Town of Long Beach (the "Town") to construct a seawall and attached drawings and other requested information. At the time, at the request of Anne Heywood, the Clerk-Treasurer of the Town, McCormick identified where the seawall was to be located on a survey prepared by professional surveyor Steven Thate.[1] A building permit, signed by Clerk-Treasurer Heywood, was issued on January 24, 2011. McCormick began construction of the seawall in the early part of February 2011.

---

[1] At the BZA hearing, McCormick testified that he had been a general contractor for seventeen years, that he had previously built several homes and seawalls in Long Beach, and that, in his experience, Clerk-Treasurer Anne Heywood or Bill Owens, the Town's Building Inspector, had signed off on many building permits, and that had been the practice in Long Beach for many years.

2

At some point during construction, Long Beach Building Inspector Bill Owens visited the construction site, was concerned about the height of the piles, and said that the neighbors were complaining. McCormick and Owens came to an agreement that, on the west side of the property, McCormick would cut the sheets one foot lower than the grade, and Owens was satisfied. On March 7, 2011, Owens again visited the site and verbally told McCormick that the neighbors were complaining and to stop work. McCormick was ninety percent done driving the sheet pile on the site and asked Owens to put the stop work order in writing. Owens mentioned only that the neighbors were complaining and did not at any time raise the issue of the location of the seawall with McCormick. McCormick completed construction of the seawall the following day.

On March 18, 2011, Paul Fithian, the Building Commissioner for the Town, sent a letter to McCormick stating that Fithian had discovered that construction on the property was in violation of Section 154.060 of the Long Beach View Protection Ordinance (the "Ordinance"),[2] that the specific violation pertained to the location of a structure, i.e. a septic system and steel seawall, located further than 106.6 feet from the zoning lot line abutting the Lake Shore Drive public right of way, and that McCormick was notified by the letter to

---

[2] Section 154.060 of the Ordinance, titled View Protection Standards, provided in part in Paragraph (B)(2):

> The waterfront setback from the shoreline upon which the dwelling accessory use, building or structure, shall be built on a zoning lot that abuts or, if not abutting, is adjacent to a non-buildable lot, parcel or tract of land, that abuts Lake Michigan shall be a line measured from the zoning lot line abutting the public right-of-way known as Lake Shore Drive perpendicular to said zoning lot line, a distance of 106.60 feet. No dwelling, accessory use, building or structure shall be located any closer to Lake Michigan than 106.60 feet from the zoning lot line abutting the public right-of-way known as Lake Shore Drive.

immediately stop any work in progress and develop a plan to remove any and all structures on the property located 106.6 or more feet from Lake Shore Drive. McCormick received Fithian's letter on March 21, 2011, and as of that date "[t]he project was 100 percent done," the site had been cleared of all equipment and debris, and the site had been graded. Appellant's Appendix at 335.

In July 2011, Caddyshack filed a petition for a variance to "extend the seawall beyond the 106.60 foot setback" and "extend the seawall for 36.6 feet on the west side and 36.4 feet on the East side beyond the 106.60 mark." Id. at 141. The BZA held hearings on September 13 and October 11, 2011, at which Caddyshack presented evidence and testimony in support of its petition for a variance and residents of Long Beach expressed their opinions. Caddyshack presented the testimony of McCormick and surveyor Thate, documentary evidence of the building permit documents, the survey prepared by Thate, correspondence, and photographic evidence of the damage to the property following the December 2010 storm and the construction of the seawall. Thate testified that an aerial photograph taken in 2005 shows that approximately thirty-four structures were located in violation of the 106.6-foot setback and that about seventeen of those were seawalls.[3] Caddyshack presented a letter from appraiser Alan Landing which stated that he looked at the improvements on the property, did not know of any such improvements that have impacted surrounding property values negatively, and that homes along the lakefront have long had seawalls and he had yet to hear of one that caused an impact to the value of a neighbor. Caddyshack also presented

---

[3] The exhibit of the photograph is not included in the record.

evidence of the work to remove the seawall and estimates of the cost of the removal of $247,575 and $295,125. Steve Parrett, a subcontractor who worked on the seawall, testified that he believed the seawall actually helped protect the neighboring properties and that removing the seawall would be very difficult, time consuming, and costly. The residents' opinions included that the seawall created an eyesore, that Caddyshack and McCormick should have known of the 106.6-foot restriction in the Ordinance, and that it would set a bad precedent for the BZA to grant the variance. Caddyshack's counsel argued that the BZA "itself has in the past granted variances from the [] Ordinance," that it "did so at [its] August 9th meeting of this year when [it] granted by a four-to-one vote a variance from this very same 106.60-foot set-back for the Osborne Trust request," and that "that was 27.5 feet. So, it was significant, and close to what we're talking about in our situation." Id. at 271-272.

The BZA voted to deny Caddyshack's request for a variance. The BZA adopted written findings and decisions dated October 11, 2011, finding in part that it was injurious to the morals and general welfare of the citizens of the Town to allow a contractor to build a structure that it should have known violated the Ordinance, that the contractor should have known a building permit signed by the Town's Clerk-Treasurer was improperly issued, and that the contractor acted at its peril in relying on the permit. The BZA further found that the use and value of the area adjacent to the property would be affected in a substantially adverse manner. The BZA found that the letter from Alan Landing submitted by Caddyshack "does not show that any reasonable study was performed on the area adjacent to the property included in the variance to justify the BZA determining that the use and value of adjacent properties would not be affected in a substantially adverse manner." Id. at 332. The BZA

also found that the strict application of the Ordinance would not result in practical difficulties in the use of Caddyshack's property because "[t]he record in these proceedings is devoid of any evidence whatsoever showing that a seawall could not be built within the 106.6 ft. setback as required by Sec. 154.060" of the Ordinance and that "[t]here is an existing buried seawall at 103.0 ft. from Lakeshore Drive . . . . There is no testimony stating that this seawall, as it presently exists, or with modification could not provide whatever protection [Caddyshack] believes it needs for its property." Id.

On November 9, 2011, Caddyshack filed a verified petition for review with the trial court. Following the parties' submissions of memoranda and a hearing, the court entered a thirty-page order on January 7, 2013 affirming the decision of the BZA. The court first found that the Ordinance as applied did not constitute an unconstitutional taking and that the BZA was not estopped from denying Caddyshack's request for a variance. The court then addressed the findings and decision of the BZA, focusing on the provisions of Ind. Code § 36-7-4-918.5 regarding the approval of a variance, including when the approval would not be injurious to the public, when the use and value of the area would not be affected in a substantially adverse manner, and when the strict application would result in practical difficulties in the use of the property.[4]

---

[4] Ind. Code § 36-7-4-918.5 provides:

A board of zoning appeals shall approve or deny variances from the development standards (such as height, bulk, or area) of the zoning ordinance. A variance may be approved under this section only upon a determination in writing that:

> (1)     the approval will not be injurious to the public health, safety, morals, and general welfare of the community;

With respect to whether approval of Caddyshack's requested variance would be injurious to the public, the court found that there was no evidence to support the BZA's findings that McCormick should have known the building permit was invalid as it was signed by the Clerk-Treasurer of the Town, that there was no evidence the Clerk-Treasurer was unauthorized to sign the building permit, that Owens made several visits to the work site, knew of the construction and monitored its progress, and did not contest the building permit, and that the record did not include evidence that would lead a reasonable person to conclude the permit was improperly issued. The court further found it was undisputed that Owens verbally asked McCormick to stop construction on March 7, 2011, that McCormick received a written stop work order from Building Commissioner Paul Fithian on March 21, 2011, and that as of that date the work on the seawall was finished and the worksite was cleaned up. The court observed that the reasoning of the BZA was based on whether Caddyshack obtained an invalid building permit and had knowledge of the setback requirement, that this was not a proper evaluation of whether granting a variance would be injurious to the public, and that the claims of the remonstrators were not substantiated by any evidence other than mere personal opinions. The court then found that "[n]ot a single reason given by the BZA . . . . has even an inference about the view that should be protected under the [O]rdinance and how granting the variance would be injurious to the public." Id. at 24.

---

(2)    the use and value of the area adjacent to the property included in the variance will not be affected in a substantially adverse manner; and

(3)    the strict application of the terms of the zoning ordinance will result in practical difficulties in the use of the property. However, the zoning ordinance may establish a stricter standard than the "practical difficulties" standard prescribed by this subdivision.

With respect to whether the use and value of the area adjacent to the property would be affected in a substantially adverse manner, the court found that professional land surveyor Thate testified that the seawall would not affect the surrounding properties in any way regarding the view or property values, appraiser Alan Landing stated that property values of lots adjacent to Caddyshack's property would not be adversely affected, and Parrett testified that the seawall "may actually help neighboring properties from the storms and it would not be in any way adverse to neighboring properties." Id. at 25. The court found that the BZA's finding that the opinion of professional land appraiser Landing was lacking a "reasonable study," was not founded in fact, evidence, or sound reasoning, that the BZA did not explain what a reasonable study "would look like or what Landing's evaluation should have been," and that the BZA's "unexplained rejection of an expert witness's testimony while ignoring all other evidence that corroborates the expert's opinion is erroneous." Id. at 25. The court found there was significant evidence in the record that the seawall does not substantially affect the use and value of adjacent properties. The court also found that there was no evidence "that any dwelling, accessory use building or structures's view is blocked, or the use and value of such property has been substantially affected," that "[t]here was other evidence presented by professionals that would prove that the adjacent properties would not be adversely affected," and that "[b]ecause the BZA makes this general denial of an expert's opinion and fails to address other expert testimony, the findings of the BZA on this issue is not supported by evidence." Id. at 27.

Finally, the court addressed the practical difficulties arising from strict application of the Ordinance and, in doing so, examined whether there was significant economic injury,

whether the injury was self-created, and whether feasible alternatives were available. With respect to economic injury, the court acknowledged Caddyshack's claims that there could be potential storm damage to the property and there would be significant costs associated with removing the seawall. The court found that "[t]here is not enough evidence to support that complying with the [O]rdinance would result in significant economic injury," that "[p]otential damage is not enough to show that there will be significant economic injury," and that "[t]his point goes further to accentuate that feasible alternatives have not been explored." Id. at 29. The court found "[t]here is no evidence showing that the seawall could not be built in compliance with the [] Ordinance," that there was "an existing seawall built at 103.0 ft.," and that it could not conclude "that the findings of the BZA were clearly erroneous on this point." Id.

As to whether the injury was self-created, the court found that Caddyshack purchased the land in question years ago and that it is responsible for knowing and abiding by local zoning ordinances. The court acknowledged Caddyshack's claim that there would be significant costs involved in removing the seawall as it currently exists, but found that "[t]he additional cost associated with removing the seawall is not a significant economic injury associated with whether the variance should be granted" and that, "[e]ven if there was an economic injury sustained by [Caddyshack] in removing the seawall, it would be to a large extent self-imposed as the seawall was built in violation of the [] Ordinance setback requirement." Id. at 30. Finally, with respect to whether there are feasible alternatives available, the court found that, "[w]hile Caddyshack offered uncontroverted evidence that the seawall was built to protect the home from storm damage, there is no evidence to support

9

why the seawall had to be built at that location and that there were no other feasible alternatives." Id. at 31. The court further found:

> The standard of review of this Court is limited. While the evidence to support a conclusion by the BZA may be minimal, this Court cannot reweigh the evidence. The BZA concluded that there was no evidence supporting that the current location of the seawall was the only place that would work and that there are no feasible alternatives. A reasonable person could conclude that there is enough evidence in the record to support this finding. As a result, it must be concluded there is substantial evidence to support the finding that Caddyshack has not met its burden here, and there is no clear error in the findings of the BZA as to the reasoning regarding the practical difficulties in strict adherence to the zoning ordinance.

Id. The court found that "[t]he practical difficulties portion of the analysis is where Caddyshack fails to meet the burden and the alternative placement of the seawall was not addressed." Id. at 31-32. The court concluded that, "[w]ithout reweighing the evidence presented, this Court must conclude that the [BZA] had sufficient evidence to find that the denial of the variance would not result in practical difficulties" and that, "[w]hile the third factor is just one of the three statutory considerations, only one of the factors outlined above must be supported to uphold the decision of the BZA." Id. at 34. The court concluded that the decision of the BZA was not arbitrary or capricious or unsupported by the evidence "when it found that strict application of the . . . [O]rdinance would not result in practical difficulties in the use of property for which the variance is sought." Id. Caddyshack filed a motion to correct errors, and, after a hearing, the trial court denied the motion.

DISCUSSION

The issue is whether the trial court erred in affirming the decision of the BZA that the seawall constructed on Caddyshack's property is in violation of the Ordinance and must be

10

removed. Caddyshack contends the court erred in finding that it will not suffer practical difficulties in protecting its property if the 106.6-foot setback requirement in the Ordinance is imposed and that the practical difficulties include an inability to protect its deck, pool, and home. In support of its position, Caddyshack argues the evidence demonstrated that waves came very close to the outer wall of its property during a storm in December 2010, that pictures from the storm showed damage to the home's drainage system and an extreme loss of sand, that the original septic system was located beyond the 106.6-foot line, that photographs of the construction of the seawall demonstrate that the construction involves significant trenching which can threaten the integrity of the deck or pool unless construction is separated by significant distance, that a deck could extend to the 123.4-foot mark and be nine feet higher than the seawall under the Ordinance, and, if built, such a deck would need to be protected from the sand erosion problems demonstrated by the December 2010 storm, that a substantial number of Long Beach residents along the Lake Michigan shore enjoy the right to protect their property by having their seawalls beyond 106.6 feet, and that the BZA had previously granted a variance from the Ordinance to another property owner. Caddyshack further argues that its economic injury includes the cost of constructing the seawall and the future cost of removing the seawall if it is required to conform to the setback requirement. Caddyshack maintains that there was no testimony concerning a buried seawall and that a review of the survey exhibits demonstrates that the buried seawall offers no protection for the deck or to check erosion of the yard. Caddyshack also argues that the Ordinance does not apply to its seawall because there are vacant lots on either side of its

property and the wall is akin to a fence, that enforcement of the Ordinance constituted an impermissible taking, and that the BZA should be estopped from enforcing the Ordinance.

The BZA maintains that its decision should be affirmed. It argues that Caddyshack did not prove that significant economic injury would result from its compliance with the Ordinance, that any injury would be largely self-created by Caddyshack, and that Caddyshack did not provide any evidence to support why the seawall had to be built beyond the limits in the Ordinance. The BZA further argues that the Ordinance applies to the seawall as the wall is a structure and not a fence and the properties adjacent to the vacant lots could be affected by the obstruction of a view of the lake, that the BZA should not be estopped from denying the variance, and that there has been no taking of Caddyshack's property.

A trial court and an appellate court both review the decision of a zoning board with the same standard of review. Wastewater One, LLC v. Floyd Cnty. Bd. of Zoning Appeals, 947 N.E.2d 1040, 1045 (Ind. Ct. App. 2011) (citing St. Charles Tower, Inc. v. Bd. of Zoning Appeals of Evansville-Vanderburgh Cnty., 873 N.E.2d 598, 600 (Ind. 2007)), trans. denied. A proceeding before a trial court or an appellate court is not a trial *de novo*; neither court may substitute its own judgment for or reweigh the evidentiary findings of an administrative agency. Id. "In the context of zoning adjudications, we will set aside specific findings only if they are clearly erroneous, meaning the record lacks any facts or reasonable inferences supporting them." Network Towers, LLC v. Bd. of Zoning Appeals of LaPorte Cnty., Ind., 770 N.E.2d 837, 844 (Ind. Ct. App. 2002) (internal quotation marks and brackets omitted). A court may provide relief only if it determines that the person seeking relief has been prejudiced by the BZA's action that is (1) arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. Ind. Code § 4-21.5-5-14(d); Wastewater One, 947 N.E.2d at 1045 (noting a zoning board is "an administrative agency with expertise in zoning matters" and that the scope of a court's review is governed by Ind. Code § 4-21.5-5-14); see also Ind. Code § 36-7-4-1614 (eff. Jul. 1, 2011) (same substantive provisions related to judicial review of zoning decisions made by a board of zoning appeals). The burden of demonstrating the invalidity of the BZA's decision is on Caddyshack as the party to the judicial review proceeding asserting invalidity. Ind. Code § 4-21.5-5-14(a); Ind. Code § 36-7-4-1614(a).

Section 154.060 of the Ordinance, entitled View Protection Standards, provides in part:

> (B) It is the intent of these standards to protect the view of Moon Valley, the Long Beach Golf Course and any water body from the principal permitted building (such as residence or accessory use, building or structure).
>
> (1) No dwelling or accessory use, building or structure located on a zoning lot in which the property line abuts or, if not abutting, is adjacent to a non-buildable lot, parcel or tract of land, that abuts Moon Valley, the Long Beach Golf Course or any water body shall block the view of any other dwelling, accessory use building or structure located on an adjacent zoning lot in which the property line abuts or, if not abutting, is adjacent to a non-buildable lot, parcel or tract of land, that abuts Moon Valley, the Long Beach Golf Course or any water body.
>
> (2) The waterfront setback from the shoreline upon which the dwelling accessory use, building or structure, shall be built on a zoning lot that abuts or, if not abutting, is adjacent to a non-buildable lot, parcel or tract of land, that abuts Lake Michigan shall be a line measured from the zoning lot line

13

abutting the public right-of-way known as Lake Shore Drive perpendicular to said zoning lot line, a distance of 106.60 feet. No dwelling, accessory use, building or structure shall be located any closer to Lake Michigan than 106.60 feet from the zoning lot line abutting the public right-of-way known as Lake Shore Drive.

(3)     Notwithstanding any language contained in this section nor in any other section or provision of this chapter there may be added adjacent to the dwelling, building or structure to be built on a zoning lot that abuts or, if not abutting, is adjacent to a non-buildable lot, parcel or tract of land, that abuts Lake Michigan, a deck which may extend no further than a line measured from the zoning lot line abutting the public right-of-way known as Lake Shore Drive perpendicular to said zoning lot line a distance of 123.40 feet.  Any such deck, or that portion of a deck which extends beyond a line measured from the zoning lot line abutting the public right-of-way known as Lake Shore Drive perpendicular to said zoning lot line a distance of 106.60 feet, shall be subject to the following:

(a)     All decks must either be ground level or elevated no higher than the elevation of the first story floor.  The term ["]first story["] shall be defined as that level of living space of a structure, the floor of which has as its elevation, the height closest to the elevation of the center line of the public right-of-way known as Lake Shore Drive measured immediately adjacent to the building lot.

(b)     Notwithstanding division (B)(3)(a) hereinabove, a deck shall be allowed to be constructed at an elevation equal to, but no higher than, the elevation of an existing first story deck on an adjacent zoning lot.

(c)     No decks shall be allowed to be constructed or attached to a structure at a height equal to or greater than the second story floor. The term ["]second story["] shall be defined as that level of living space of a structure, the floor of which has an elevation greater than the

14

> elevation of its first story floor as defined in
> division (B)(3)(a) hereinabove.

We first address the assertion by Caddyshack that the Ordinance does not apply to its property or seawall. The evidence does not show that the seawall in this case is more akin to a fence or does not constitute a structure as contemplated by the Ordinance or that the BZA or trial court erred in finding that the seawall was governed as a structure under the Ordinance. The record includes photographs and testimony regarding the seawall, the construction of the seawall which included earth anchors and driving steel sheet piles down into the clay layer of the ground, and the extensive nature of the work to remove the seawall and the estimated cost of the removal. In addition, while there may be no buildings on the parcels immediately adjacent to Caddyshack's property,[5] we cannot say the Ordinance by its terms or the 106.6-foot setback requirement in Section 154.060 is inapplicable to Caddyshack's property on this basis. By its terms, the requirements of Paragraph (B)(2) apply to properties abutting Lake Michigan. In light of the language of Section 154.060 of the Ordinance, the fact that the seawall on Caddyshack's property may not actually block the view of another dwelling or structure in violation of Paragraph (1) of Section 154.060, a determination which it appears the BZA did not rely upon in addressing the application of the Ordinance,[6] does not mean that Section 154.060 of the Ordinance, and Paragraph (B)(2) in particular, is not applicable to the property.

---

[5] The trial court in ruling on Caddyshack's motion to correct errors found that there are lots to the east and west of the property that are vacant. The survey in the record indicates the lot to the west is approximately thirty feet in width and the lot to the right is a public access lot.

[6] The findings of the BZA related to the practical difficulties in the use of the property if the 106.6-foot setback requirement in the Ordinance was to be applied.

We next turn to whether the decision of the BZA denying Caddyshack's request for a variance was supported by the evidence. Ind. Code § 36-7-4-918.5(a) provides:

A board of zoning appeals shall approve or deny variances from the development standards (such as height, bulk, or area) of the zoning ordinance. A variance may be approved under this section only upon a determination in writing that:

(1)   the approval will not be injurious to the public health, safety, morals, and general welfare of the community;

(2)   the use and value of the area adjacent to the property included in the variance will not be affected in a substantially adverse manner; and

(3)   the strict application of the terms of the zoning ordinance will result in practical difficulties in the use of the property. However, the zoning ordinance may establish a stricter standard than the "practical difficulties" standard prescribed by this subdivision.

The evidence before the BZA, as determined by the trial court and not challenged by the BZA on appeal, did not support the BZA's findings under subsections (1) and (2) of Ind. Code § 36-7-4-918.5. Thus, we address the court's finding under subsection (3) of Ind. Code § 36-7-4-918.5 that the denial of the requested variance would not result in practical difficulties in the use of Caddyshack's property. We have articulated several factors for a reviewing court to consider in determining whether compliance with a zoning ordinance will result in practical difficulties: (1) whether "significant economic injury" will result if the ordinance is enforced; (2) whether the injury is self-created; and (3) whether there are feasible alternatives. Edward Rose of Indiana, LLC v. Metro. Bd. of Zoning Appeals, Div. II, Indianapolis-Marion Cnty., 907 N.E.2d 598, 605 (Ind. Ct. App. 2009) (citing Metro. Bd. of Zoning Appeals v. McDonald's Corp., 481 N.E.2d 141, 146 (Ind. Ct. App. 1985) (citations

16

omitted), <u>clarified</u> <u>on</u> <u>other</u> <u>grounds</u> <u>on</u> <u>reh'g</u>, 489 N.E.2d 143, <u>trans.</u> <u>denied</u>), <u>trans.</u> <u>denied</u>.

<u>See</u> <u>also</u> <u>Town of Munster Bd. of Zoning Appeals v. Abrinko</u>, 905 N.E.2d 488, 492 (Ind. Ct.

App. 2009) (noting the factor of "whether any feasible alternative is available, within the

terms of the ordinance, which achieve the same goals of the landowner"). These factors are

not exclusive. <u>See</u> <u>Edward Rose</u>, 907 N.E.2d at 605.

With respect to the factor of whether significant economic injury will result if the

Ordinance is enforced, we recognize that it is not possible to predict with certainty the

damage to improvements on the property which may occur if the seawall were not installed

and the cost associated with repairing such damage. However, this is the case to some degree

with respect to many if not most preventative measures such as the construction of seawalls

and of course does not mean that all variance requests for such structures may or must be

denied on this basis. In this case, Caddyshack presented testimony before the BZA regarding

the damage to its property as a result of the December 2010 storm and photographs which

were taken within a couple of days after the storm. One of the owners of Caddyshack

testified that, in investigating the storm, he "had seen that the waves came up very close to

[the] outer wall of [the] property."[7] Appellant's Appendix at 212. McCormick testified that

the storm "sheared the property" and "created a cliff . . . from the existing grade there, about

five, six feet." <u>Id.</u> at 225. He testified that "[t]he cliff also sheared so that there was some

drainage pipes for the guttering and the pool deck system; there was a couple six-inch pipes

that were exposed." <u>Id.</u> McCormick referenced the photographs and stated "it shows . . .

---

[7] This reference to the outer wall may refer to the buried seawall or the edge of the pool or other improvements.

there's two drain tiles for the gutters on the house, and for the pool deck drains." Id. at 225-226. He further testified that the owners had a pool, patio systems, and a very expensive home that they wanted to protect. The trial court, in assessing the feasible alternatives factor discussed below, found that "Caddyshack offered uncontroverted evidence that the seawall was built to protect the home from storm damage . . . ." Id. at 31. The damage caused by the storm prompted Caddyshack to have McCormick install the seawall at issue, and the distance between the edge of the pool and the 106.6-foot setback line is relatively short.[8] The evidence above and in the record shows that the factor of whether significant economic injury will result if the setback requirement is enforced weighs in favor of a finding that compliance with the setback requirement will result in practical difficulties in the use of the property.

In addition, we recognize that Caddyshack is charged with knowledge of the applicable setback requirements and that Caddyshack and McCormick did not seek and obtain a variance from the BZA to the setback requirements prior to installing the seawall. However, prior to the issuance of the building permit and at the request of Clerk-Treasurer Heywood, McCormick identified on a survey the proposed location of the seawall Caddyshack wished to install, and the building permit was then issued. During construction, Building Inspector Owens visited the site several times and, while he discussed the height of the piles at one point, he did not at any time raise the issue of the location of the seawall with

---

[8] As noted below, the survey shows a buried seawall located very near the outside edge of the pool, and the buried seawall appears to be approximately three or three and one-half feet within the 106.6-foot setback line.

18

McCormick. McCormick testified that Heywood or Owens had signed off on many building permits for the Town. The factor of whether any injury was self-created does not weigh heavily in favor of a finding that compliance with the setback requirement will or will not result in practical difficulties in the use of the property.

We next consider the factor of whether any feasible alternative was available, within the terms of the 106.6-foot setback, which achieved the same goals of the landowner. The BZA stated there was no showing that a seawall could not be built within 106.6 feet of Lake Shore Drive. The trial court similarly found that "there is no evidence to support why the seawall had to be built at that location and that there were no other feasible alternatives." Id. at 31. The survey before the BZA shows the 106.6-foot line, the location of the constructed seawall beyond the 106.6-foot line by 36.6 feet at the western boundary and 36.4 feet on the eastern boundary of the property, and the location of a buried seawall near a line marked by a set iron rod at 103.0 feet from Lake Shore Drive along the eastern boundary of the property. On the survey, the line representing the buried seawall does not extend all the way to the eastern boundary of the property, which appears to be due to an "Existing Septic System."[9] See id. at 173. The survey shows that the buried seawall is located very near to the outside edge of the pool on the property. Caddyshack also presented photographs and testimony

_____

[9] A "Proposed Pump Tank" is shown on the survey within the 106.6-foot setback. Appellant's Appendix at 173. The record includes a letter dated May 27, 2011, from the LaPorte County Health Department to Caddyshack stating that the on-site septic system installed in 2008 was not installed in the approved location and that it must be properly abandoned and a new system installed in the area that was originally approved. Also, Paragraph (B)(3) of Section 154.060 of the Ordinance permits decks to extend to 123.4 feet from Lake Shore Drive. We do not consider the location of the "existing septic system," shown on the survey as located beyond the 106.6-foot setback requirement, or the separate setback requirement applicable to decks in evaluating whether there are feasible alternatives for the seawall which comply with the 106.6-foot setback requirement.

19

regarding the installation of the seawall, including McCormick's testimony that he drove approximately twenty-five sheets "and toe them into the clay layer, which is about 10, 15 feet below the grade of the lake right now . . . around the high water mark level" and that he drove sheet pile of different lengths ranging from approximately twenty to twenty-five feet. Id. at 226. As noted above, the court found the seawall was built to protect the home from storm damage. The evidence shows that there would have been few, if any, practical alternatives to a seawall within the 106.6-foot setback requirement that would adequately protect the property and that could be installed within the setback without damaging the improvements. The factor of whether there were feasible alternatives which would have complied with the setback requirement which achieved the same goals of the landowner weighs in favor of a finding that compliance with the setback requirement will result in practical difficulties in the use of the property.

In addition, Caddyshack presented evidence of the work to remove the seawall and estimates of the cost for removal of $247,575 and $295,125. The scope of work for the estimates provides in part: "Will cut off cap and water. Will extract sheetpiling if possible. Will dig out soil anchors and remove drain tile. If sheetpiling does not come out with extractor, then the sheetpiling will have to be dug out. Dewatering will be required to pump water out of hole to cut sheets apart." Id. at 187. Subcontractor Parrett testified that it would be "almost impossible to take [the seawall] out," that he would "have to do dewatering to get down far enough to get to extract and cut these sheets off, if [he could not] get them all the way out," and that "then when [they did] get this out, it's going to be a tangled mess of metal that [they would] have to transport down the beach, up through the access, and dispose of it."

20

Id. at 244-245. McCormick testified that "[s]oil anchors are rods that are drilled at about a 30-degree angle from the sheet piling into the earth, so if water gets behind it, it won't pull the sheet pile back," that "[t]hey're about 15, 20 feet, at least, long," that "they're every four feet in the wall," and that "we have about 80 feet of seawall." Id. at 237. He also testified that a dewatering wall would need to be constructed along Lake Michigan and diesel-driven pumps would be used to pump the water out. The evidence establishes that the cost associated with removal of the seawall would be substantial. These substantial removal or relocation costs, in light of our discussion above regarding the factor of whether any injury was self-created and observing in part that the Town did not object to the location of the seawall before or during its construction, provides an additional consideration which favors the conclusion that compliance with the setback requirement will result in practical difficulties in the use of the property.

Based upon the evidence before the BZA, we conclude that Caddyshack demonstrated that strict application of the setback requirement will result in practical difficulties in the use of the property under Ind. Code § 36-7-4-918.5(3). Further, as noted above, we do not disturb the findings of the trial court with respect to subsections (1) and (2) of Ind. Code § 36-7-4-918.5. Accordingly, we reverse the order of the trial court which had affirmed the denial of the variance and remand.[10]

---

[10] Because we reverse based upon the evidence under Ind. Code § 36-7-4-918.5, we need not address Caddyshack's estoppel and impermissible taking claims.

21

CONCLUSION

For the foregoing reasons, we reverse the trial court's order affirming the decision of

the BZA and remand for any necessary proceedings consistent with this opinion.

Reversed and remanded.

MAY, J., and BARNES, J., concur.