

FILED
Jun 18 2015, 5:42 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Libby Y. Goodknight
Marc T. Quigley
Krieg DeVault LLP
Indianapolis, Indiana

Blake P. Holler
Krieg DeVault LLP
Carmel, Indiana

ATTORNEYS FOR APPELLEES JEFFREY R. BAUMGARTH AND THE MYERS Y. COOPER COMPANY

Brian J. Tuohy
John J. Moore
Doninger Tuohy & Bailey
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

I-465, LLC,

*Appellant,*

v.

Metropolitan Board of Zoning Appeals Division II of Marion County, Indiana, Jeffrey R. Baumgarth and The Myers Y. Cooper Company,

*Appellee*

June 18, 2015

Court of Appeals Case No. 49A05-1409-PL-403

Appeal from the Marion Superior Court No. 7

The Honorable Michael D. Keele, Judge

Cause No. 49D07-1212-PL-047644

**Friedlander, Judge.**

I–465, LLC appeals a decision by the Marion County Metropolitan Board of Zoning Appeals (the BZA) approving a request for a property-use variance by Jeffrey R. Baumgarth and Myers Y. Cooper Co. (collectively referred to as Myers Cooper). I–465 challenges the adequacy of the BZA's findings of fact and whether they support the BZA's determination that Myers Cooper established the elements necessary to justify the variance it sought.

We affirm.

This is the second time the present dispute has come before this court. The background facts were set out in the previous appeal as follows:

> In September 2012 Myers Cooper filed a petition for a variance with the BZA for 4048 West 94th Street in Indianapolis ("the Property"). In its petition, it requested permission to establish "a domestic canine and feline boarding and day-care facility also providing grooming services with fenced outdoor exercise area for supervised daytime use, operating under the name PetSuites" on the Property. The Property is located in a C–6 zone, which does not allow kennel or dog-boarding services to be established.
>
> At the November 13, 2012 BZA meeting, Raymond Cooper presented Myers Cooper's petition. I–465 LLC, which owns the Hilton Homewood Suites Hotel immediately to the west of the Property, appeared at the hearing to contest the variance petition. Specifically, I–465 LLC was concerned about the noise of the animals that would be staying adjacent to its hotel and believed that its hotel would be substantially and adversely affected if the BZA granted Myers Cooper's proposed variance.
>
> The BZA approved the variance at the November meeting on the condition that animals would be permitted in the outside play area only between 7:00 a.m. and 8:00 p.m.

*HRC Hotels, LLC v. Metro. Bd. of Zoning Appeals Div. II of Marion Cnty.*, 8 N.E.3d 203, 204-05 (Ind. Ct. App. 2014) (internal footnote and citations to the record omitted).

[4]     As it turned out, only I–465, not its parent company HRC Hotels, appeared or participated in the BZA public hearing. HRC Hotels did not present any evidence at any time opposing the variance. Nor did it submit a written statement to the BZA contesting the variance. Yet, the petition for judicial review of the BZA decision was filed by HRC Hotels, not I–465. Myers Cooper filed a motion to dismiss the petition for judicial review, arguing that HRC Hotels lacked standing. The trial court ultimately granted the motion to dismiss, ruling that it did not have subject matter jurisdiction over the appeal because HRC Hotels lacked standing. HRC Hotels appealed, and this court reversed. We concluded that the standing requirements of Ind. Code Ann. § 36-7-4-1603 (West, Westlaw current with all 2015 First Regular Session of the 119th General Assembly legislation effective through June 28, 2015) are procedural rather than jurisdictional and therefore the trial court did have subject matter jurisdiction. Further, we held that the trial court should allow I–465, a real party in interest, to be substituted as the plaintiff and proceed to the merits of the petition for judicial review.

[5]     The case was remanded and the trial court conducted a review of the BZA's grant of Myers Cooper's application for a variance. At this hearing, I–465 detailed the nature of its objections to the variance, including among others, the following: 1) Having more than 200 dogs within 45 feet of the hotel next door

would present a "serious noise issue" for hotel guests, *Appellant's Appendix* at 26; and 2) granting the variance would decrease the value of adjacent property because if a person was driving in the area and looking for a hotel "and it's next to a dog boarding facility, and there are dogs out in the yard, you're going to be much more likely … to drive right on by and try to find someplace that's a little more peaceful and in a more neighborhood like setting." *Id.* at 42.

[6] In support of its petition for a variance, Myers Cooper offered detailed information[1] about its plans for the PetSuites facility, including: 1) the building is attractive in design and includes cupolas, a pitched roof, stone wainscoting, and shuttered windows; 2) dense landscaping would be used to screen the outside play area for dogs, which would be oriented toward the nearby interstate and away from neighborhoods and surrounding businesses; 3) the outdoor play area would be buffered from the western and northern boundaries by an eight-foot-tall acoustical CMU block wall in order to mitigate the sound of dogs barking; and 4) dogs would be permitted outdoors in limited numbers only between the hours of 7:00 a.m. and 8:00 p.m., during which time PetSuites staff members would take each dog outside for fifteen minutes in the morning and afternoon. Myers Cooper also presented evidence that the Pike Township Residents Association (the PTRA) voted unanimously to support the variance, and the PTRA concluded that the PetSuites development would bring "much-

---

[1] Much of this information was presented in a BZA staff report, which was supplemented with additional material following an indecisive October 9, 2012, vote by the BZA. With the full report, including the additional material, in hand, the BZA voted on November 13, 2012, 3-2 in favor of granting the variance.

needed property tax revenue to the city of Indianapolis and Pike Township."
*Id.* at 123. Following the hearing, the trial court denied I–465's petition for judicial review and affirmed the BZA's zoning decision. This appeal ensued.

[7] A zoning board may, within its discretion, approve or deny a variance from the terms of the applicable zoning ordinance. *Schlehuser v. City of Seymour*, 674 N.E.2d 1009 (Ind. Ct. App. 1996). Pursuant to I.C. § 36-7-4-918.4 (West, Westlaw current with all 2015 First Regular Session of the 119th General Assembly legislation effective through June 28, 2015), in order to obtain a variance a petitioner must demonstrate that each of the following elements is present:

> (1) [T]he approval will not be injurious to the public health, safety, morals, and general welfare of the community;
>
> (2) the use and value of the area adjacent to the property included in the variance will not be affected in a substantially adverse manner;
>
> (3) the need for the variance arises from some condition peculiar to the property involved;
>
> (4) the strict application of the terms of the zoning ordinance will constitute an unnecessary hardship if applied to the property for which the variance is sought; and
>
> (5) the approval does not interfere substantially with the comprehensive plan adopted under the 500 series of this chapter.

When reviewing a zoning board's decision on a request for a variance, we apply the same standard as the trial court. *Caddyshack Looper, LLC v. Long Beach Advisory Bd. of Zoning Appeals*, 22 N.E.3d 694 (Ind. Ct. App. 2014). We presume a zoning board's determination is correct and "afford great weight to the decision of the board … by virtue of its experience in this given area." *Burcham*

*v. Metro. Bd. of Zoning Appeals Div. I of Marion Cnty.*, 883 N.E.2d 204, 216 (Ind. Ct. App. 2008) (quoting *City of Hobart Common Council v. Behavioral Inst. of Ind., LLC,* 785 N.E.2d 238, 255 (Ind. Ct. App. 2003)).  We will reverse a zoning board's decision only where a clear error of law has been demonstrated. *Burcham v. Metro. Bd. of Zoning Appeals Div. I of Marion Cnty.*, 883 N.E.2d 204.

[8]  It is not within our province in reviewing such a decision to try the facts *de novo* or substitute our judgment for that of the zoning board.  *Id.*  We may provide relief only if we determine that the party seeking relief was prejudiced by a BZA decision that is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence.  Ind. Code Ann. § 4–21.5–5–14(d) (West, Westlaw current with all 2015 First Regular Session of the 119th General Assembly legislation effective through June 28, 2015); *see Caddyshack Looper, LLC v. Long Beach Advisory Bd. of Zoning Appeals*, 22 N.E.3d 694.  In making these determinations, we cannot reweigh the evidence or reassess witness credibility.  *Burcham v. Metro. Bd. of Zoning Appeals Div. I of Marion Cnty.*, 883 N.E.2d 204.  Instead, we accept the facts as found by the zoning board.  *Id.*  A zoning board's determinations as to questions of law, however, are not entitled to deference and are reviewed de novo.  *Id.*  As the party challenging the BZA's decision, I–465 bears the burden of demonstrating the decision was invalid.  I.C. § 4–21.5–5–14(a); I.C. § 36–7–4–1614(a) (West,

Westlaw current with all 2015 First Regular Session of the 119th General Assembly legislation effective through June 28, 2015).

[9] At the hearing before the trial court, I–465 conceded that the first element, i.e., that approval of the variance will not be injurious to the public health, safety, morals, and general welfare of the community, had been adequately established.

[10] The second element Myers Cooper was required to establish was that the use and value of the adjacent area will not be affected in a substantially adverse manner. I–465 claimed that the value and use of its adjoining property would be adversely affected because of the noise that barking dogs would generate, and generally that the sight of dogs next door to its hotel would cause potential hotel patrons to drive elsewhere and seek accommodations not so-situated. The BZA found that Myers Cooper had addressed these concerns, and thus established the second element, by noting first that PetSuites is an upscale pet resort with a national reputation for high-quality service, utilizing award-winning building designs. The BZA also noted that the development of this vacant property would energize commercial activity and attract consumer spending, thereby helping to increase property values in the area. The evidence supported these findings.

[11] We note that there was also evidence that specifically addressed the noise concerns I–465 expressed. Myers Cooper retained eNoise Control, an expert in the field of noise control, to study the effect on the surrounding properties of

dogs barking in the proposed facility's outdoor play area. eNoise Control conducted a study and submitted written findings and recommendations. It noted that none of I–465's hotel rooms face the proposed facility, but they do face nearby Interstate I-465. The study found that noise from traffic on the interstate is louder than the noise that would be created by barking dogs in the play area. Thus, it found that dogs barking in the play area will not increase the perceived sound level or measured sound level at the property line of the Property. Further, assuming the current ambient traffic noise, the installation of the promised sound wall, and that hotel guests would keep windows closed, eNoise Control concluded that hotel patrons inside the hotel will not hear dogs barking. Concerning future uses on the adjoining property on the opposite side of PetSuites proposed facility, eNoise Control concluded that they will be located too far from the Property to be affected by any noise from the proposed facility.

[12] eNoise Control also submitted a letter from a Homewood Suites hotel in Lexington, Kentucky, which is located adjacent to an existing PetSuites facility. That letter stated that since the opening of the Homewood Suites in Lexington, "there have been no environmental or noise issues with PetSuites." *Appellant's Appendix* at 13. Although the BZA did not mention the noise issue in its findings with respect to this element, this evidence specifically addressed the major concern expressed by I–465 in opposing the variance. It therefore supports the finding that the value of I–465's property will not be diminished.

In light of the foregoing, we conclude that I–465 did not carry its burden of demonstrating that the trial court committed a clear error of law in finding that the use and value of the adjacent property will not be adversely affected by the granting of the variance. *See Caddyshack Looper, LLC v. Long Beach Advisory Bd. of Zoning Appeals*, 22 N.E.3d 694.

We turn now to the next element that Myers Cooper was required to establish, i.e., that the need for the variance arises from some condition peculiar to the property involved. The peculiarity in question must relate to the specific features of the property, such as unusual shape or relatively small acreage, *see Metro. Sch. Dist. of Washington Twp., Marion Cnty. v. Janssen*, 158 Ind. App. 234, 302 N.E.2d 541 (Ind. Ct. App. 1973) (when viewed in conjunction with the adjoining commercial use and railroad tracks, unusual shape and relatively small acreage was found to be sufficient evidence of the peculiar condition in this context), not merely the owner's desired use of the property.

The BZA entered the following findings of fact with respect to this element:

> The current C-6, thoroughfare commercial district, does not provide for a variety of specific service uses which are appropriate for interstate adjacent sites and which are permitted in preceding commercial zones (C-4 & C-5). The proposed use relies on visibility and accessibility offered by interstate adjacent sites. Proposed use is appropriate for an interstate adjacent site and the thoroughfare commercial district as communities seek to buffer neighborhood districts from the intensity of interstate activity.

*Appellant's Appendix* at 129. I–465 claims that these findings of fact say nothing about the condition of the property, whether peculiar or not, and therefore are

not pertinent to this element. Accordingly, I–465 argues, these findings are inadequate to support the conclusion that the need for a variance arises from a condition peculiar to the Property.

[17]    Even were we to assume that I–465 has a point in this regard, this is not to say that there was no evidence presented by Myers Cooper that would support the conclusion that this element was established. In fact, the trial court aptly summarized this evidence, which it described as "substantial", as follows:

> As depicted in the Indy GIFs Map included in the BZA staff report and the amended site plan, the Site is a dead-end site with limited access. There is no direct access from I–465 or Michigan Road to the Site. The Site is relatively small and is an unusual "flag-like" configuration. It is much narrower than the two adjacent hotel parcels and accommodates the limited parking. The Site's small size and unusual shape limit the development that could occur on the Site. The Site's restrictive zoning classification, location, size and configuration are conditions that support the BZA's finding that the need for the variance arises from conditions peculiar to the Site.

*Id.* at 14 (internal citations to record omitted). I–465 claims, however, that Myers Cooper offered no such evidence in the proceeding before the BZA. In an attempt to remedy the "fatal flaw in the BZA's Decision", the argument goes, Myers Cooper raised the issue of the irregular shape, size, and condition of the Property for the first time in its petition for judicial review. *Id.* at 15. The evidence germane to this allegedly new claim was what I–465 describes as "a paper diagram of the various zoning districts in the area, which included a shaded region purportedly depicting" the Property. *Id.* According to I–465, the trial court exceeded its purview in "relying upon this post hoc evidence to justify the property use variance after the fact." *Appellant's Brief* at 15.

[18]    We first observe that the "paper diagram" to which I–465 refers is indeed a depiction of the zoning districts in the area, which was included in the staff report presented to the BZA, and does reflect the shape, size, and condition of the property. And yes, those characteristics of this parcel of real estate, as depicted in the diagram, appear to be fairly described as "irregular." This is not, however, the only peculiarity of the Property that was presented to the BZA. The BZA determined that the Property is adjacent to an interstate and serves as a buffer between residential neighborhoods and commercial interstate activity. Contrary to I–465's assertion, this determination also relates to the peculiarity of the Property. In reaching this conclusion, we reject the notion that "peculiarity" in this context refers *only* to size and shape. *See, e.g., Bowman v. Metro. Bd. of Zoning Appeals of Marion Cnty.,* 165 Ind. App. 212, 218, 331 N.E.2d 739, 742 (1975) (considering a relatively small piece of real estate without public frontage and zoned for special use as a religious retreat to be "saddled" with a condition peculiar to the property where other land in the area was of a residential or agricultural use with high quality homes); *Metro. Sch. Dist. of Washington Twp., Marion Cnty. v. Jansen,* 158 Ind. App. 234, 302 N.E.2d 541 (the Board was justified in finding the need for the variance arose from a condition peculiar to the property where there was evidence that the unusual shape and relatively small acreage, when viewed in conjunction with the adjoining commercial use and railroad track, made the property unsuitable for development as either an apartment complex or an agricultural use); *Metro. Dev. Comm'n of Marion Cnty. v. Troy Realty, Inc.,* 150 Ind. App. 213, 275 N.E.2d 845 (1971) (affirming the issuance of a variance where evidence indicated the

property was situated at one corner of a heavily trafficked intersection making it more affected by noise and fumes than the surrounding area and the area was lower and more adversely affected by water drainage than the surrounding neighborhood); *Vogelgesang v. Shackelford,* 146 Ind. App. 248, 254 N.E.2d 205 (1970) (affirming a variance where the parcel was located on a major thoroughfare and adjacent to a gas station and riding stable, making the site unsuitable for the single-family residential use for which it was zoned).

[19] The BZA determined that although the Property is situated next to an interstate highway, Myers Cooper's proposed use, which relies on visibility and accessibility such as is offered by an interstate, could serve as a buffer for nearby residential neighborhoods. Also in support of this conclusion, there was evidence that the Property is a dead-end site with limited access. It is ideal for travelers who wish to board their pets when leaving for a trip, thus making it uniquely appropriate for the proposed use. Moreover, its unusual size and shape, as depicted in the diagram, also render it appropriate for the proposed use. Therefore, the evidence supported the BZA's finding that the need for a variance arises from the aforementioned "peculiar" conditions, which in turn supported the BZA's granting of the variance.

[20] The fourth element is that the strict application of the terms of the zoning ordinance will constitute an unnecessary hardship if applied to the Property. "The determination of whether there is an unnecessary hardship justifying the grant of a variance is a question of fact for the board of zoning appeals." *Bd. of*

*Zoning Appeals of City of Whiting, Lake Cnty. v. McFadden*, 166 Ind. App. 534, 537, 337 N.E.2d 576, 578 (1975). Moreover,

> [t]he law is clear and definite in its declaration that … economic opportunity or loss [cannot] enter into the determination of the existence of unnecessary hardship. …
>
> The determination of the existence of an unnecessary hardship is governed by all the relevant factors which, when taken together, indicate that the property cannot reasonably be put to a conforming use because of limitations imposed upon it by the ordinance. It must also be shown that the land involved cannot yield a reasonable return if used only for the allowed zoned purpose, and that the use authorized by the variance will not alter the essential character of the locality.

*Id.*, 166 Ind. App. at 539, 337 N.E.2d at 579-80 (quoting *Light Co. v. Houghton*, 141 Ind. App. 93, 96-98, 226 N.E.2d 341, 343-44 (1967)).

[21] The BZA found this condition was met because C-6 zoning would permit such uses as adult entertainment, car washes, gas stations, boarding houses, bars, and "numerous other more intense uses which should legitimately be isolated from the neighborhood districts." *Appellant's Appendix* at 14. Myers Cooper's proposed use was in keeping with "the overall theme of service uses permitted in the C-6 thoroughfare commercial district." *Id.* at 14-15. Again, I–465 claims that the BZA's findings of fact "do not refer to unnecessary hardship and have no bearing whatsoever on the unnecessary hardship analysis." *Appellant's Brief* at 17. To the contrary, the BZA's findings indicate its determination that the C-6 zoning permits only limited uses, including far more commercially intense uses than Myers Cooper's proposed use. The BZA was within its discretion to determine that it would constitute an unnecessary hardship to permit those

commercially intense uses, but not permit what "is essentially a hotel for pets." *Appellant's Appendix* at 129.

[22] The fifth and final element was that the approval would not interfere substantially with the comprehensive plan for the area. The comprehensive plan for this area recommends commercial uses for the Property, including specifically a "broad range of retail, personal, professional and business services." *Id.* at 16. The BZA found that granting the variance would not interfere substantially with the comprehensive plan because the plan calls for interstate-related, service-oriented uses. The BZA found that "the pet care industry is evolving to more conveniently situated upscale facilities providing a higher level of service and accommodating increased frequency of visits." *Id.* at 129. The evidence demonstrated that PetSuites provides a service that is retail, professional, and business in nature. Thus, there was evidence to support the BZA's determination that granting the variance would not substantially interfere with the comprehensive plan for the area.

[23] In summary, after reviewing the record before us, we conclude that the BZA's decision to grant the variance was based upon its determination that Myers Cooper had established the five elements required to justify a variance, and its decision was supported by adequate findings, which in turn were supported by the evidence, and therefore not clearly erroneous. Accordingly, we affirm the BZA's decision.

[24] Judgment affirmed.

Baker, J., and Najam, J., concur.