

FILED

Jan 13 2026, 8:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



I N T H E

# Court of Appeals of Indiana

Monroe County Board of Zoning Appeals,

*Appellant-Respondent*

v.

William J. Huff, II Revocable Trust, et al.,

*Appellees-Petitioners*

---

January 13, 2026

Court of Appeals Case No.
24A-PL-2771

Appeal from the Monroe Circuit Court

The Honorable Erik C. Allen, Special Judge

Trial Court Cause No.
53C06-2303-PL-462

---

**Opinion by Judge Altice**
Judges Brown and Tavitas concur.

**Altice, Judge.**

## Case Summary

[1] The Monroe County Board of Zoning Appeals (the BZA) denied a variance sought by William J. Huff, II, as Trustee of the William J. Huff, II, Revocable Trust Declaration, Dated June 28, 2011, and Nicole E. Huff, as Trustee of the Nicole E. Huff Revocable Trust Declaration, Dated June 28, 2011 (collectively, Huff). Huff sought judicial review, and the trial court reversed the BZA's decision. The BZA appeals.

[2] We address the following issues on appeal:

> 1) Did the BZA properly treat Huff's variance request as one for a design standards variance as opposed to a use variance?

> 2) Was the BZA's determination that Huff failed to satisfy the practical difficulties criterion for a design standards variance arbitrary, capricious, and unsupported by substantial evidence?

[3] We reverse.

## Facts & Procedural History

[4] In 2017, Huff bought about 250 acres of property (the Huff Property) located between Shady Side Drive of The Shores subdivision and the shoreline of Lake Monroe. About 45 acres of the Huff Property is a peninsula often called the Chumley peninsula. The Huff Property is in an agriculture/rural reserve (AG/RR) zoning district and is also subject to Monroe County's Environmental Constraints Overlay (ECO) zoning district regulations. On lands subject to the ECO regulations, the disturbance of land on slopes greater

than 12% within 1,000 feet of the Fee Take Line of Lake Monroe is prohibited. Huff was informed of the ECO slope restrictions applicable to development on the property before purchasing it.

[5] The Huff Property, like most other properties along the shoreline of Lake Monroe, is characterized by steeply sloped hillsides and deep ravines that create ridge tops. Drives and roadways in the area are typically located along ridge tops. At the time of purchase, the Huff Property had an existing private drive (the Private Drive) that ran across the property from the end of Shady Side Drive to the end of the Chumley peninsula. The Private Drive is constructed on a ridge top.

[6] After purchasing the Huff Property, Huff reconstructed and enlarged the Private Drive and began logging activities. As a result, heavy equipment and logging trucks were moved on and off the Huff Property, with thousands of trips by big trucks on the Private Drive over a period of four or five years.

[7] In May 2019, Monroe County and its Plan Commission (collectively, the County) filed a zoning enforcement action against Huff, Cause No. 53C06-1905-PL-1125 (the Enforcement Action), and Huff responded in January 2020 with a counterclaim. Thereafter, the parties entered into a mediated agreement (the Agreement) with an effective date of October 14, 2020. The Agreement provided in part:

1. The County will not take any action concerning past logging activities.

2. The County MS4 Coordinator and an Engineer chosen by the Huffs will jointly assess the current status of erosion control on the Huff Property relating to the Huffs' activities. If no instances of non-compliance are found, no further action is required. If instances of non-compliance are found, the MS4 Coordinator and the Engineer will agree to a remedy, which will be implemented by the Huffs. If the MS4 Coordinator and the Engineer are unable to agree to a remedy, the Huffs will work with the Assistant Planning Director to resolve the dispute….

***

4. To determine the Urban Area of the Huff[] [P]roperty, [Huff's attorney] will produce a map of the "urban area" that complies with IC 36-7-4-1103, subject to County agreement. The accepted map will be used for purposes of future development of the Huff Property[.]

***

7. The Huffs agree that prior to beginning any residential, commercial, non-agricultural construction, the Huffs will seek all necessary permits.

8. At the conclusion of the processes described in number 2 above, the County will issue a press release that states: The County has reached an agreement with the Huffs to resolve the lawsuit. The County has determined that the site is in compliance with all County erosion control requirements and does not pose a threat to the Monroe County water supply.

*Appellant's Appendix Vol. 3* at 105. Despite the Agreement, disputes have continued to persist among the parties.

[8]     On April 9, 2021, Huff met with staff for the County to discuss development of the Huff Property to include residences and other structures. During the meeting, Huff indicated that he wanted to reconstruct a portion of the Private Drive. Staff responded that such would require Huff to seek and obtain a variance from the slope restrictions of the ECO zone.

[9]     In August 2021, Huff submitted a site plan to the County, which included plans for a main residence that utilized the Private Drive without encroaching thereon. Thereafter, on February 20, 2022, Huff obtained from his architect new plans for the main residence, which expanded the footprint of the main residence with it extending over a portion of the Private Drive.

[10]    Meanwhile, without obtaining a variance or permits, Huff constructed an approximately 350-foot-long by 20-foot-wide segment (the New Drive Segment), which created a bypass of the section of the Private Drive over which the main residence was planned. The following is a photograph of the New Drive Segment, the lower of the two roads:



*Id.* at 120. The New Drive Segment construction required cutting and filling within Area 1 of the ECO zone and resulted in land disturbance in an area exceeding a 12% slope. It also caused disturbance of natural vegetation beyond the 12% slope.

[11] On March 9, 2022, the County filed a motion in the Enforcement Action seeking judicial authorization to enter upon the Huff Property to inspect for compliance with zoning laws and the terms of the Agreement. The County included aerial photographs from February 2022 in its motion showing construction activity related to the New Drive Segment. The trial court granted the motion on March 23, 2022, and two days later denied Huff's motion to stay the order.

[12] On April 18, 2022, the County's MS4 Coordinator, Kelsey Thetonia, met with Huff's engineer, Todd Borgman, to assess the status of erosion control on the

Huff Property. Planning department personnel also came onto the Property to conduct a zoning enforcement inspection. At the time, construction of the New Drive Segment had been completed. The County documented these land-disturbing activities on the Huff Property, which occurred within the ECO zone on slopes greater than 12%. The next day, Huff submitted new site plans to the County. These included plans with the footprint of the main residence that would require usage of the New Drive Segment.

[13] In the Enforcement Action on June 29, 2022, the County filed a motion to enforce the Agreement. Among other things, the County alleged that Huff had violated Condition 7 of the Agreement by engaging in residential, non-agricultural construction – the New Drive Segment leading to residential sites – without obtaining an improvement location permit, a grading permit, or a variance from the land slope restrictions. The County also alleged, with respect to Condition 4 of the Agreement, that the parties had been unable to agree on a map of the urban area of the Huff Property that complied with Ind. Code § 36-7-4-1103. And with respect to Condition 2, the County alleged that the MS4 Coordinator's inspection revealed evidence of non-compliance, requiring further action to remedy erosion control issues.

[14] Huff responded that the New Drive Segment was constructed solely for the purpose of performing logging activities outside the urban areas and thus did not require permits or a variance. Specifically, he argued that requiring permits or a variance for the New Drive Segment would violate I.C. § 36-7-4-1103. On another point, Huff argued that Condition 4 in the Agreement, as typed by the

County, was different from the handwritten agreement memorialized at the mediation.

[15] Following a hearing in the Enforcement Action, the trial court issued an order on November 5, 2022 (the Enforcement Order). The court first determined that the typed version of the Agreement was controlling and that pursuant to Condition 4, Huff must go through the variance application process after the map of the urban area is agreed upon. Next, the court determined that Huff had violated Condition 7, explaining:

> Section 1103 prevents enactment of an ordinance that would prevent or alienate the property owner's right to log the property outside urban areas. The applicable zoning to the property is AG/RR. The Ordinance allows for logging/forestry within the zone, with certain conditions. One of those conditions is to require a property owner to have an approved site plan prior to the activity, and allows the use only on parcels five or more acres in size. **The County is not preventing logging on the property…. Enforcement of the manner and location on which a logging road is built does not violate the Ordinance**.
>
> Under the Ordinance, the construction of a road requires an improvement location permit. A road is a structure under the Ordinance. Under 814-1, (A) A person shall obtain an improvement location permit prior to: (1) constructing, reconstructing, moving, enlarging, demolishing, or structurally altering any building or other structure. An ILP is not required for "(4) structures which are used exclusively for agricultural production purposes, and which do not exceed the limitations stated in the definition for confined feeding operations in Chapter 802." While the Court accepts that the roads on the Huff property, whether initially on the lot or otherwise improved by

Huff[] to access his timber, may be used for agricultural purposes, it is abundantly clear that the roads have a dual purpose, which is to facilitate access to residential sites on the property. A grading permit is also required.

The County asserts that the road built on the property is in the ECO zone, and the land slope in the area exceeds 12%. Therefore, the County argues, Huffs need a variance from the land slope restrictions. This requirement was discussed with Mr. Huff at the April 9, 2021 meeting, at which time the plans were being reviewed. At that point, it appears that the road may not have been modified yet, but it is clear that after inspection this past spring, the road had been built. It does not matter that the road may have been used for agricultural purposes, because that use will not be exclusive. In April 2021, Mr. Huff was advised that he would need a variance, and he disagreed at that time. **As explained above, the Huffs were required to apply for a permit to construct the road, and because the road was built in ECO Zone Area 1, regardless of whether he was using the road for agricultural purposes, he requires a variance**….

*Appellant's Appendix Vol. 3* at 109 (emphasis added). Finally, the court noted that Condition 2 appeared not to have been completed yet by the parties, and thus the County was unable to issue the press release addressed in Condition 8.

[16] As relevant here, the trial court in the Enforcement Action ordered Huff to "either rebuild the road[1] or obtain a variance to bring the [New Drive

---

[1] "Rebuild the road" was understood by the BZA as meaning to remove the New Drive Segment and return to using the bypassed portion of the Private Drive. We agree that this is a reasonable interpretation when read in context, and Huff has not argued otherwise.

Segment] in compliance with applicable statutes."[2] *Id*. at 110. The court also enjoined Huff from "further building, development, modification of structures or other land disturbing activities on [the Huff Property] until required approvals are obtained." *Id*. at 111.

[17] On December 6, 2022, Huff initiated an appeal of the Enforcement Order **and** applied to the BZA for a variance from the slope restriction. On Huff's motion, the appeal was dismissed by this court on May 4, 2023, and the cause was remanded to the trial court.

[18] Meanwhile, Huff continued to pursue a variance from the BZA. His variance request provided: "The property lies in ECO Zone Area 1 and is restricted from land disturbance on slope 12 percent or greater according to Monroe County ordinances. We are requesting relief from the 12 percent slope restriction to use an existing logging/agriculture road for residential purposes." *Id*. at 2.

[19] On December 14, 2022, the County informed Huff that his variance application had been accepted and that it was scheduled for a hearing before the BZA on January 4, 2023. Huff sent out required notices on December 15, alerting neighbors of the public hearing to address Huff's request for a "Design

---

[2] We note that Huff misrepresents this order and suggests that it permitted him to continue to use the New Drive Segment for agricultural purposes without a variance. On the contrary, this order makes clear that "because the road was built in ECO Zone Area 1, regardless of whether [Huff] was using the road for agricultural purposes, he requires a variance." *Id*. at 109. The trial court reasoned that enforcement of the manner and location on which a logging road is built does not violate I.C. § 36-7-4-1103.

Standards Variance (Residential)" from the "Environmental Constraints Overlay Area 1[.]" *Id*. at 5.

[20] On December 28, 2022, the BZA meeting packet was forwarded to Huff, which included a staff report that identified the variance request as an after the fact design variance. In this report, the staff recommended denial of the requested variance and provided supporting materials and proposed findings.

[21] On January 3, 2023, the day before the BZA hearing, Huff requested a continuance until the BZA meeting on February 1, 2023, as he needed additional time to address the 48-page staff report. The BZA granted the requested continuance. Thereafter, on January 11, Huff submitted 210 pages of materials in support of the variance request and claimed, for the first time, that his variance request should be reviewed as a use variance rather than a design standards variance.

[22] On January 25, 2023, the BZA meeting packet was forwarded to Huff. These materials included a recommendation from staff to repeal and replace Article VII (Powers and Duties) of the BZA Rules of Procedure. As relevant here, the proposed new Article VII included:

> 2. With respect to its power to grant variances, the Board shall determine whether a variance application is for a variance of use or for a variance from the development standards of the Zoning Ordinance. For purposes of making such a determination, the Board shall apply the following criteria:

> a. A "use variance" is a variance permitting a use other than that permitted in a particular district by Zoning Ordinance.
>
> b. A "development standards variance" (aka, a design standards variance) is a variance permitting a physical change in the condition of real property that would not otherwise be permitted by the Zoning Ordinance, including without limitation, the design, scope, number, or location of structures or other improvements to real property (e.g., height, bulk, area, density, setbacks, etc.).

*Appellant's Appendix Vol. 4* at 147. This amendment was needed because the BZA did not yet have a rule concerning the determination of whether a variance request is for a use variance or a design standards variance. *See* I.C. 36-7-4-916(a)(5) ("The board of zoning appeals shall adopt rules … concerning … the determination of whether a variance application is for a variance of use or for a variance from the development standards (such as height, bulk, or area.").

[23] At the beginning of the meeting on February 1, 2023, the BZA adopted the proposed rule amendment. The BZA later turned to Huff's variance request and determined, consistent with the staff recommendation, that it was for a design standards variance. That is, the BZA rejected Huff's position that he was seeking a use variance.

[24] Next, the BZA addressed the merits of Huff's variance request. The staff recommended denial of the design standard variance sought by Huff, with a presentation by Tammy Behrman, assistant director of the Monroe County Planning Department. Behrman detailed why staff believed that the Huff

Property did not present practical difficulties requiring a variance. This included that significant areas of steep slopes were common in the Lake Monroe area and thus not unique to the Huff Property. Behrman also noted that staff had driven on the Private Drive several times without difficulty, that other areas of the Private Drive were just as steep as the bypassed portion, and that the Private Drive had been used by large trucks for logging and transporting construction materials (including hauling gravel) for several years prior to creation of the New Drive Segment.[3] Behrman opined that the variance was not necessary because the "existing private drive provides safe and reasonable access … for purposes of use and development, be it residential, recreational, agricultural[,] of the property." *Appellant's Appendix* Vol. 4 at 114. And she added that the Private Drive "could have been maintained and used" without the New Drive Segment. *Id*. at 115. Behrman suggested that the New Drive Segment was likely constructed to make room for the larger footprint of the main residence as provided in the revised plans, which showed the residence extending across the Private Drive. *See id*. at 96 (pointing to the plans submitted in April 2022 and stating, "the petitioner's footprint for the development that they desire has extended into the existing drive, which is why most likely they were prompted to build this new drive").[4]

---

[3] Photographs from 2020 of heavy equipment and logging trucks on the Chumley Peninsula were submitted into evidence.

[4] Moving the road substantially increased the buildable area for the main residence. *See id.* at 97.

Huff then presented affidavits addressing the steepness, sharp drop-off, and tight curve of the bypassed portion of the Private Road. The affidavits noted safety concerns regarding these conditions, as well as difficulties experienced by logging companies, including equipment malfunctions, while traversing the steep slope. As a result, loggers began using bulldozers to transport equipment, which was inconvenient and more costly. The affiants opined that the New Drive Segment was safer due to its flatter slope and larger curve. Jered Vehling, a logger, maintained that if the New Drive Segment was removed, he would not return to using the bypassed portion of the Private Road and would again use bulldozers to drag equipment off the road.

During public comments, Michael Kane, a neighboring property owner, questioned Huff's motive for putting in the New Drive Segment. Kane testified that there had been "very intense" logging on the Huff Property that appeared to be "pretty much over" by 2021. *Id.* at 105. He explained further:

> [T]hey've used that road for years to do extensive development all the way down to the Chumley Peninsula. They dragged in machinery there that is absolutely huge. I mean, it can barely negotiate the curves of the paved part of Shad[y] Side Drive. I think it's a little disingenuous now to suddenly say that it's unsafe. Thousands of big trucks have gone back and forth there in the last 4 or 5 years…. I don't buy the argument of a safer road, personally. I think this is about building a bigger vacation house.

*Id.* at 122-23. Two other members of the public spoke against issuance of the variance, noting environmental concerns regarding protecting water quality, as Lake Monroe is a water source for the community.

[27] Todd Borgman, a civil engineer, testified on behalf of Huff. He stated in part:

> It is possible for vehicles to go up there, and they were able to log on it. But that does not mean that it was safe, and that does not mean that it was the best option. There is no doubt in my mind that this new road is safe for the Huff family, for delivery drivers, for firemen, for EMS and for police officers.

*Id.* at 122. Pointing to the affidavits, Huff's attorney then emphasized Huff's position that this was a public safety issue.

[28] Throughout the meeting, BZA Member Guy Lofton expressed skepticism regarding Huff's claim that the New Drive Segment was needed for logging. For example, Member Loftman stated:

> The road that they used for a lot of logging worked for all of the logging they did until they put in this new road. To me, saying that that is not sufficient for agricultural purposes is inconsistent with the fact that it did serve for agricultural purposes. It's hard. It's expensive. Some people, some contractors might say, well, I've had enough of this project, and you had to find somebody who you'll probably have to pay more. But that road is sufficient. There's no need for putting in another road. It doesn't deprive them of any use. It doesn't meet the design standards and I don't see any justification for saying now that a lot of logging is done, conceivably not all of it but a whole lot of logging is done, they suddenly need a new road. It's it [sic] was sufficient for all the

logging that was done. It's sufficient for the logging that needs to be done. So, that is [how] I view that road.

*Id*. at 110.

[29] In response to Huff's argument that it would defy common sense and go against public safety to deny the variance, Member Dee Lofton stated:

> You know, all [requirements for obtaining a design standards variance] have to be met, I'm not hearing that. I did hear [Huff's counsel] say that this defies logic, and I think that being told by Planning Staff on the April 9, 2021, what was needed in order to make this road, and defying that, that defies logic to me. If you know what to do, and you have been told what to do, and you don't do it, and you go and do what you want, anyway, that is not somebody that I trust …. So I think defying logic goes both ways.

*Id*. at 125.

[30] Further, Member Pamela Davidson acknowledged the safety concerns raised in the affidavits submitted by Huff. Regarding future logging, Member Davidson observed: "Well, all the loggers said, gee, if we're going to do any more logging, **which we all wonder about**, but if they're going to do more logging, we're going to do it in a far more expensive way because we do not trust the road, and we've been using it." *Id*. (emphasis supplied).

[31] The BZA denied Huff's variance request at the February meeting. On March 3, 2023, Huff filed a petition for judicial review of the BZA's decision. Huff argued, in relevant part: 1) the BZA's determination that Huff was seeking a

design standards variance, rather than a use variance, was arbitrary and capricious, and 2) the BZA's determination that Huff is not entitled to a design standards variance was arbitrary and capricious. Thereafter, on April 5, 2023, the BZA issued extensive written findings of fact and conclusions in support of its February decision. Huff later added to his arguments on judicial review that several of the BZA's findings were unsupported by any evidence in the record.

[32] Following briefing, the trial court held a short hearing on December 8, 2023. Then on October 15, 2024, the trial court issued a forty-page order reversing the BZA's zoning decision. In reversing, the trial court set aside many of the BZA's findings. The court also determined that the BZA's denial of a variance violated I.C. § 36-7-4-1103 – because it precluded Huff from continuing logging the property – and was arbitrary and capricious and unsupported by substantial evidence, regardless of whether analyzed as a use variance or a design standards variance.

[33] The BZA appeals, arguing that the trial court erroneously reweighed the evidence, excluded certain evidence, and used its own findings and discretion to reverse. Additional information will be provided below as needed.

## Standard of Review

[34] We review a decision of a zoning board by the same standard as the trial court. *St. Charles Tower, Inc. v. Bd. of Zoning Appeals of Evansville-Vanderburgh Cnty.*, 873 N.E.2d 598, 600 (Ind. 2007). In other words, we stand in the shoes of the trial

court and owe no deference to its decision. *See Baliga v. Ind. Horse Racing Comm'n*, 112 N.E.3d 731, 736 (Ind. Ct. App. 2018), *trans. denied*.

[35] "The burden of demonstrating the invalidity of a zoning decision is on the party to the judicial review proceeding asserting invalidity." I.C. § 36-7-4-1614(a). The reviewing court shall grant relief only if it determines that the party seeking judicial relief has been prejudiced by a zoning decision that is:

> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (2) contrary to constitutional right, power, privilege, or immunity;
>
> (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (4) without observance of procedure required by law; or
>
> (5) unsupported by substantial evidence.

I.C. § 36-7-4-1614(d).

[36] As relevant here, a decision is arbitrary and capricious "if it is patently unreasonable" or "made without consideration of the facts and in total disregard of the circumstances and lacks any basis which might lead a reasonable person to the same conclusion." *Dep't of Bus. & Neighborhood Servs. of Consol. City of Indianapolis v. H-Indy, LLC*, 166 N.E.3d 347, 356 (Ind. Ct. App. 2021). And a decision is unsupported by substantial evidence "if there is no relevant evidence which a reasonable mind might accept as adequate to support a conclusion." *Id*. at 356-57; *see also St. Charles Tower*, 873 N.E.2d at 601.

[37] For questions of fact, our review of disputed facts is generally confined to the BZA record, and we "may not try the cause de novo or substitute [our] judgment for that of the board." I.C. § 36-7-4-1611. That is, neither the trial court nor this court may reweigh the evidence or reassess witness credibility. *See H-Indy, LLC*, 166 N.E.3d at 356. We will set aside specific findings of the BZA only if they are clearly erroneous, meaning the record lacks any facts or reasonable inferences supporting them. *See Caddyshack Looper, LLC v. Long Beach Advisory Bd. of Zoning Appeals*, 22 N.E.3d 694, 701 (Ind. Ct. App. 2014).

[38] Where questions of law are involved, however, different standards of review apply:

> For mixed questions of law and fact, we review [the BZA's] conclusions for their reasonableness. And for questions of law, we decide independently whether the [BZA] action is contrary to law, including whether the [BZA] stayed within its jurisdiction and conformed to the statutory standards and legal principles involved in producing its decision, ruling, or order.
>
> We interpret ordinances and statutes using the same methodology. The interpretation of both is a question of law. We review such legal questions anew, giving the lower tribunal no deference.

*See Noblesville, Ind. Bd. of Zoning Appeals v. FMG Indianapolis, LLC*, 217 N.E.3d 510, 513-14 (Ind. 2023) (internal quotations and citations omitted).

## Discussion & Decision

### 1. This case involves a design standards variance, not a use variance.

Pursuant to I.C. § 36-7-4-916(a)(5), the BZA adopted a rule for determining whether a variance application is for a use variance or a design/development standards variance. That rule, located in BZA Rule of Procedure Article VII, provides:

> 2. For purposes of making such a determination, the Board shall apply the following criteria:
>
>> a. A "use variance" is a variance permitting a use other than that permitted in a particular district by Zoning Ordinance.
>
>> b. A "development standards variance" (aka, a design standards variance) is a variance permitting a physical change in the condition of real property that would not otherwise be permitted by the Zoning Ordinance, including without limitation, the design, scope, number, or location of structures or other improvements to real property (e.g., height, bulk, area, density, setbacks, etc.).

*Appellant's Appendix Vol. 4* at 147.

Applying this rule, the BZA classified Huff's variance request as one for a design standards variance. The BZA reasoned that Huff sought a variance from the 12% slope restriction, which is a land disturbance restriction relating to a physical change in the condition of real property. If granted, the BZA explained, the variance "would result in after-the-fact authority for … location

of the New Drive Segment on slopes greater or equal to 12%, i.e., it would authorize the construction of the New Drive Segment, which is a structure, in a location not otherwise permitted by the Zoning Ordinance." *Id*. at 148. The BZA rejected Huff's claim that he needed a use variance to use the New Drive Segment for residential purposes, as opposed to agricultural purposes, explaining:

> 57. Table 2-1 of Section 802-5 of the Zoning Ordinance ("Table 2-1") lists the types of land uses that are permitted in each of the Monroe County zoning districts.
>
> 58. Pursuant to Table 2-1, there are 53 permitted uses of the Huff Property, including for example, agricultural uses, residential uses, bed and breakfast uses, retail uses, and recreational and amusement uses.
>
> 59. Access drives constructed in accordance with the Zoning Ordinance (e.g., in an authorized location), may be used for any use of the Huff Property authorized by Table 2-1 (e.g., agricultural, residential, and amusement and recreational uses).
>
> 60. A design … standards variance from the 12% slope restrictions of the ECO Zone Area 1, if granted, would place the New Drive Segment in an authorized location so that it could be used for any permitted use of the Huff Property.
>
> 61. Because agricultural and residential uses are already permitted uses of the Huff Property, the [] variance request cannot, by definition, be considered as a use variance request.
>
> 62. Granting a use variance [] would not relieve the New Drive Segment of the 12% slope restrictions of the ECO Zone Area 1 regulations.

*Id*.

[41] On its face, the BZA's determination that Huff's request constitutes a design standards variance request is in accord with the BZA rule set forth above and is not arbitrary or capricious. Huff, however, relies on I.C. § 36-7-4-1103(b) (Section 1103(b)) to argue that his petition must be considered as one for a use variance. Section 1103(b) provides: "This chapter does not authorize an ordinance or action of a plan commission that would prevent, outside of urban areas, the complete use and alienation of any mineral resources or forests by the owner or alienee of them." *Id*. Huff reasons that under this provision, he could not be required to obtain a variance from the 12% slope restriction to construct and use the New Drive Segment for logging purposes,[5] and thus he was only seeking a variance to also **use** the New Drive Segment for residential purposes. The effect of the BZA's decision to treat this as a design standards variance, according to Huff, was to prevent him from continuing to log the Huff Property in violation of Section 1103(b).

[42] Huff made this same argument in the Enforcement Action and lost. That is, the trial court in that case determined that Section 1103(b) did not relieve Huff from the obligation to obtain a variance from the 12% slope restriction before building the New Drive Segment. And, in fact, the court ordered Huff to either obtain a variance for the New Drive Segment or remove it. Huff then filed the instant request for a variance. Although he also initiated an appeal of the

---

[5] There is no dispute that the New Drive Segment is outside of urban areas.

Enforcement Order, he later voluntarily abandoned that appeal during the pendency of this judicial review action.

[43] The BZA argues that Huff should not be allowed to relitigate the Section 1103(b) issue in this judicial review action. We agree.

> Generally, collateral estoppel operates to bar a subsequent relitigation of the same fact or issue where that *fact or issue* was necessarily adjudicated in a former suit and the same fact or issue is presented in the subsequent lawsuit. In that situation, the first adjudication will be held conclusive even if the second action is on a different claim. [W]e consider two factors on the issue of collateral estoppel: (1) whether the party against whom the prior judgment is pled had a full and fair opportunity to litigate the issue; and (2) whether it would be otherwise unfair under the circumstances to permit the use of collateral estoppel. If those two elements are fulfilled, then the court may apply collateral estoppel to prevent relitigation of the same issue.

*Midwest Mins., Inc. v. Wilson*, 983 N.E.2d 1180, 1190 (Ind. Ct. App. 2013) (emphasis in original) (internal citations omitted).

[44] Huff does not respond to the collateral estoppel argument except to assert that the BZA is raising it for the first time on appeal. On the contrary, the Enforcement Order was admitted into the record at the BZA hearing and referenced several times. Then in the judicial review action, the BZA asserted the affirmative defense of estoppel and included findings and conclusions related to this argument in its proposed order to the trial court. In sum, the BZA argued below that the ruling in the Enforcement Action could not be attacked in this judicial review action. Huff had a full and fair opportunity to litigate the

Section 1103(b) issue in the Enforcement Action, and he does not argue that any circumstances exist that would make it unfair to apply collateral estoppel. Accordingly, we do not reach the merits of the Section 1103(b) issue, which was already decided against Huff in the Enforcement Action.

**2. The BZA's determination that Huff failed to satisfy the practical difficulties criterion for a design standards variance is not arbitrary, capricious, or unsupported by substantial evidence.**

[45] To obtain a design standards variance, Huff was required to establish each of the following:

> (A) the approval … will not be injurious to the public health, safety, and general welfare of the community, because:
>
>> (1) it would not impair the stability of a natural or scenic area;
>>
>> ***
>>
>> (4) it would adequately address any other significant public health, safety, and welfare concerns raised during the hearing on the requested variance;
>
> (B) the approval … would not affect the use and value of the area adjacent to the property included in the variance in a substantially adverse manner …; and,
>
> (C) the approval … is the **minimum variance necessary to eliminate practical difficulties** in the use of the property, which would otherwise result from a strict application of the terms of the Zoning Ordinance.

Monroe Cnty. Ordinance 812-6 (emphasis added). The failure to establish even one of these criteria is sufficient to defeat Huff's variance request. *See Sam's E., Inc. v. United Energy Corp.*, 927 N.E.2d 960, 964 (Ind. Ct. App. 2010), *trans. denied*.

[46] We will focus our analysis on the BZA's conclusion that Huff failed to establish the practical difficulties criterion. For variance purposes, "practical difficulties" means "a significant development limitation that":

> (A) arises from conditions on the property that do not generally exist in the area (i.e., the property conditions create a relatively unique development problem);
>
> (B) precludes the development or use of the property in a manner, or to an extent, enjoyed by other conforming properties in the area;
>
> (C) [c]annot be reasonably addressed through the redesign or relocation of the development/building/structure (existing or proposed); and,
>
> (D) [m]ay not be reasonably overcome because of a uniquely excessive cost of complying with the standard.

Monroe Cnty. Ordinance 801-2.

[47] Before reaching the merits of the practical difficulties issue, we stop to observe important points that the trial court appears to have overlooked. The BZA was entitled to consider the staff report as evidence, and Behrman properly appeared at the meeting and presented evidence in opposition to the granting of the

variance. *See Burton v. Bd. of Zoning Appeals of Madison Cnty.*, 174 N.E.3d 202, 217 (Ind. Ct. App. 2021) ("These findings were based upon a report submitted by the staff of the planning commission which was viable evidence that formed a basis for the findings."), *trans. denied*; *Allen v. Bd. of Zoning Appeals for City of Noblesville*, 594 N.E.2d 480, 484 (Ind. Ct. App. 1992) ("The Board is entitled to consider the staff report as evidence."); Ind. Code § 36-7-4-920(e) (providing that staff "may appear before the board at the hearing and present evidence in support of or in opposition to the granting of a variance or the determination of any other matter"). Further, it has long been understood that hearings before a zoning board are "conducted rather informally" and do not require testimony to be sworn or exhibits to be authenticated. *Vehslage v. Rose Acre Farms, Inc.*, 474 N.E.2d 1029, 1034 (Ind. Ct. App. 1985).

[48] The trial court, therefore, erred by refusing to consider Behrman's presentation at the meeting as evidence. Moreover, there are many instances where the trial court improperly reweighed the evidence to come to findings inconsistent with the BZA's findings. Because our review is de novo, we do not take time to address the 351 findings issued by the trial court.

[49] We now turn to the BZA's determination that "the use, slope, and configuration" of the bypassed portion of the Private Drive do not constitute a practical difficulty for purposes of the design standards variance criteria. *Appellant's Appendix Vol. 4* at 157. In making this determination, it is evident that the BZA considered all the evidence presented at the meeting. That is, contrary

to Huff's assertion on appeal, the BZA did not ignore any of the evidence presented by Huff.

[50] The BZA issued findings with respect to each of the five affidavits that Huff put into evidence. The BZA findings related to the affidavit of Logan Freeman, a logger on the Huff Property, include:

> 80. The Affidavit of Logan Freeman expresses concerns based on the steepness of the existing Private Drive and the shoulder drop off from the existing drive.
>
> 81. The Affidavit of Logan Freeman does not state or demonstrate that steepness of the land on which the existing Private Drive is located or the shoulder drop off are conditions peculiar to the Huff Property.
>
> 82. The Affidavit of Logan Freeman expresses concern about vehicles being able to view and pass other vehicles on the existing Private Drive in the area of the New Drive Segment.
>
> 83. The Affidavit of Logan Freeman does not state or demonstrate that his concerns regarding visibility and passing on the existing drive arise from conditions on the Huff Property that do not generally exist in the area of the Huff Property or that are peculiar to the Huff Property.
>
> 84. The Affidavit of Logan Freeman does not state or demonstrate that measures other than the construction of the New Drive Segment, such as widening the existing Private Drive on the flat land directly to the east of the existing Private Drive and installing guardrail, could not be implemented to allow vehicles to safely view and pass one another in that area of the Huff Property.

85. The Affidavit of Logan Freeman expresses concern regarding the expense of hauling equipment up the existing Private Drive.

86. The Affidavit of Logan Freeman does not state or demonstrate that the cost of hauling equipment on the existing Private Drive arises from conditions on the Huff Property that do not generally exist in the area of the Huff Property or that are peculiar to the Huff Property.

87. The affidavit of Logan Freeman does not state or demonstrate that the cost of exclusively relying on the existing Private Drive would deprive the Huffs of all reasonable economic use of the Huff Property, including residential use and recreational and amusement uses.

88. The affidavit of Logan Freeman does not state or demonstrate that the use of the existing Private Drive has prevented or will prevent the Huffs from alienating timber resources from the Huff Property.

*Appellant's Appendix Vol. 4* at 150. These findings, which are nearly identical to those related to the other logger's affidavit, emphasize omissions in the averments regarding information relevant to the practical difficulties question.[6]

---

[6] The trial court acknowledged that the affidavits each failed to state that the conditions on the Huff Property do not generally exist in the area, but the court found "it is clearly implied and the reasonable inference to be drawn therefrom make the BZA's conclusion unreasonable." *Appellant's Appendix Vol. 2* at 35. However, the BZA is properly tasked with making inferences from the evidence, not a reviewing court. *See Habig v. Harker*, 447 N.E.2d 1114, 1117 (Ind. Ct. App. 1983) ("Courts may not make findings for an administrative agency based upon the evidence in the record: that is the agency's duty, and courts may only review, not make, even by inference, such findings.").

[51] Similarly, the BZA findings address the affidavit of Stephen Smith, an engineer and surveyor who provided services at the Huff Property. Smith's affidavit described the bypassed portion of the Private Drive as "a tight horizontal curve with tight vertical curve and steep slope [that] creates a hazardous situation for vehicles, even at very slow speed." *Appellant's Appendix Vol. 3* at 125. The BZA recognized Smith's safety concerns regarding the configuration of the curve and his opinion that this portion of the Private Drive needed to be reconstructed. The BZA, however, observed that Smith did not "state or demonstrate that measures other than the construction of the New Drive Segment … could not be implemented to allow vehicles to safely view and pass one another in that area of the Huff Property." *Appellant's Appendix Vol. 4* at 150. Further, the BZA noted that Smith did not state or demonstrate that the configuration of the curve arose from conditions that do not generally exist in the area or that use of the existing Private Drive would deprive Huff of all reasonable economic use of the property or prevent Huff from alienating timber resources.

[52] Finally, regarding the affidavits submitted by Huff, the BZA addressed those of Sergeant Bennett Dillon of the Monroe County Sheriff's Department and firefighter Josh Tapp. These affidavits indicated that the New Drive Segment was a safer option for drivers and emergency response vehicles, noting concerns regarding the steepness of the Private Drive and the resulting difficulty of seeing oncoming traffic coming over the hill. But the BZA found, among other things, that these affidavits did not state or demonstrate that these safety concerns arose from conditions that do not generally exist in the area or that the safety

concerns could not be addressed by measures other than construction of the New Drive Segment.

[53] Juxtaposed with the affidavits submitted by Huff, the BZA made many findings based on other evidence presented at the meeting. These included the acknowledgment by Huff's civil engineer, Borgman, that the Private Drive had been used to remove timber resources from the Huff Property and could continue to be used. Further, the BZA found that Huff's attorney failed to argue that the purported need for the variance arose from conditions on the property that do not generally exist in the area. Indeed, Huff's attorney made no arguments before the BZA regarding practical difficulties and rather focused his argument on the safety of the Private Drive without reference to surrounding properties.[7] And Huff did not present any evidence describing the conditions on nearby properties as related to those on his property.

[54] The BZA findings also addressed Assistant Planning Director Behrman's presentation of testimony and exhibits in support of the staff's recommendation to deny the variance. These findings included, among others:

> 121. The steep slopes and the existing Private Drive (ridgetop access drive) are conditions on the Huff Property that generally exist on properties in the area of the Huff Property.

---

[7] Even in this appeal, Huff's arguments related to practical difficulties are rather slim and essentially amount to requests to reweigh the evidence.

122. The steep slopes and the existing Private Drive (ridgetop access drive) on the Huff Property do not create or constitute relatively unique development problems.

123. The existence of the Private Drive on the Huff Property, which has been used for years to access the Huff Property and to remove timber resources from the Huff Property, belies any claim that access to the property by trucks or other vehicles is a significant development limitation.

124. There is at least one other portion ("Other Portion") of the existing Private Drive that is as steeply sloped and of the same width as the portion leading up to the New Drive Segment and for which the Huffs are seeking a variance.

125. Loaded logging trucks would be required to drive up the Other Portion in order to leave the Huff Property.

126. The Huffs do not contend that the Other Portion is a significant development limitation.

*Id*. at 153.[8]

[55] The BZA made additional findings that are relevant to its determination regarding practical difficulties, including:

---

[8] Huff asserts, and the trial court found, that there is no support in the record for the findings related to the Other Portion of the Private Drive. On the contrary, Behrman presented the BZA with severe slope maps of the area, as well as other exhibits, to point out portions of the Private Drive that were "just as steep" as the bypassed portion. *Id*. at 96. This observation was relevant to the assertion by the loggers that they had equipment problems due to the steepness of the bypassed portion of the Private Road. Further, Huff's suggestion on appeal that the BZA did not defend these findings in the trial court is without merit. The BZA provided support for these findings at the hearing before the trial court. *See Transcript* at 20-23.

147. The portion of the existing Private Drive near the New Drive Segment could be widened in a manner consistent with the Zoning Ordinance by expanding onto the land to the east of that portion that is sloped less than 12%.

148. The curve in the portion of the existing Private Drive near the New Drive Segment could be flattened out in a manner consistent with the Zoning Ordinance by expanding onto the land to the east of that portion that is sloped less than 12%.

149. Design options existed that would have addressed the safety concerns expressed in the Huff Submission affidavits in a manner that did not require the construction of the New Drive Segment or a variance from the terms of the Zoning Ordinance.

150. Due to the presence and historic use of the existing Private Drive on the Huff Property the subsequent construction … of the New Drive Segment was not necessary to overcome a uniquely excessive cost imposed by the Zoning Ordinance.

151. Developed properties in the area of the Huff Property are mostly improved with single family dwellings and are mostly used for residential purposes.

152. Staff has inspected the Huff Property on more than one occasion and has traveled the existing Private Drive in cars and pickup trucks without difficulty.

153. There are a number of building sites available on the Huff Property that can be accessed by the existing Private Drive.

154. The existing Private Drive provides safe and reasonable access to the Huff Property of [sic] purposes of use and

> development of the property be it residential, recreational, or agricultural use and development.
>
> 155. The variance requested by the Huffs is not necessary to enable the Huffs to develop and use the Huff Property in a manner, or to the extent, enjoyed by other conforming properties in the area.
>
> 156. The variance requested by the Huffs is not necessary to eliminate a significant development limitation.

*Appellant's Appendix Vol. 4* at 155.[9]

[56] Further, the BZA recognized that Huff's newest site plan showed a residence that would extend over the bypassed portion of the Private Drive and thus require the New Drive Segment. Based on this, the BZA made the following additional findings:

> 165. The removal of the portion of the existing Private Drive that was located under the proposed dwelling's first floor footprint as shown on the Subsequent Partial Site Plan would increase the area available for the construction of the proposed dwelling.

---

[9] Huff challenges findings 147-149, arguing that no one testified regarding the possibility of widening or flattening out the bypassed portion of the Private Drive to address the expressed safety concerns. While it is true that this alternative option was not mentioned at the meeting, the BZA could reasonably make this inference from the photographs, site plans, and maps included in the exhibits, which showed buildable land (i.e., less than a 12% slope) adjacent to this portion of roadway. Regardless, it was Huff's burden to affirmatively show that other reasonable design options for the roadway, which would reduce the disturbance of land in restricted areas, did not exist. *Cf. Town of Beverly Shores v. Bagnall*, 590 N.E.2d 1059, 1063 (Ind. 1992) ("The plans which the Bagnalls submitted necessitated the complete destruction of the dune. They did not present any plans which might have minimized the damage nor did they contend that only the plan presented was feasible.").

166. The proposed dwelling shown on the Subsequent Partial Site Plan could be scaled down or reconfigured and relocated on the Huff Property in a manner that does not conflict with the existing Private Drive and in a manner that would render unnecessary the use of the New Drive Segment.

167. The location, size, and configuration of the proposed dwelling chosen by the Huffs from a number of available development sites and options does not constitute a significant development limitation imposed by the Zoning Ordinance for which a variance from the Zoning Ordinance may be sought.

168. The New Drive Segment does not resolve a significant development limitation that cannot be reasonably addressed through the redesign or relocation of the proposed dwelling shown on the Subsequent Partial Site Plan.

*Id*. at 156.

[57] Ultimately, the BZA correctly observed that it was Huff's burden to show that his variance request satisfied each of the design standards variance criterion. And it determined that Huff failed in this regard because he did not establish that the variance sought was the minimum variance necessary to eliminate practical difficulties in the use of the Huff Property.[10] Most notably, Huff did

---

[10] The BZA also determined that Huff failed to establish that granting the variance would not be injurious to the public health, safety, and general welfare of the community. In this regard, the BZA made findings related to concerns about the environmental impact of the New Drive Segment and Huff's failure to demonstrate that runoff and sediment from the New Drive Segment would not enter the perennial stream or be carried to Lake Monroe. Further, the BZA found that Huff failed to establish that granting the variance would not "substantially interfere with the environmental protection principles of the Monroe County Comprehensive Plan" or would not "impair the stability of a natural area." *Id*. at 154. Because we decide this

not establish that the alleged significant development limitations arose from conditions on the Huff Property that do not generally exist in the area or that the limitations could not be reasonably addressed by measures other than the construction of the New Drive Segment.

[58] The BZA's conclusion that Huff failed to establish the practical difficulties criterion is amply supported by the extensive findings of the BZA, which find support in the testimony and exhibits presented at the BZA meeting, and is not arbitrary and capricious. Huff's arguments on appeal amount to improper requests to reweigh the evidence and give more weight to the affidavits submitted by Huff as opposed to the evidence in opposition to the variance, including the staff report, Behrman's testimony, and the supporting exhibits. Accordingly, we reverse the trial court and affirm the BZA.

[59] Judgment reversed.

Brown, J. and Tavitas, J., concur.

---

case based on practical difficulties, we need not reach this other necessary criterion for granting a design standards variance.

ATTORNEYS FOR APPELLANT

David B. Schilling
Justin Roddye
Bloomington, Indiana

ATTORNEYS FOR APPELLEES

Chou-il Lee
Jeffrey D. Stemerick
Jeffrey W. Parker
Indianapolis, Indiana